UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JUAN JIMENEZ,

                                  Plaintiff,

        -against-

CITY OF NEW YORK, et al.,

                              Defendants.

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

21-CV-6133 (RPK) (JRC)

------------------------------------------------------------------------x

       Defendants City of New York, Bogle, Wancique, Shea, Denis, Okezie, and Simpson (hereinafter referred to as "Defendants") submit this statement pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern District of New York to set forth the material facts as to which Defendants contend there are no genuine issues to be tried.

       1.     Plaintiff Juan Jimenez filed an Amended Complaint in the Eastern District of New York on or about December 6, 2021, alleging claims of false arrest, malicious prosecution, First Amendment retaliation, and municipal liability. See Amended Complaint, annexed to the Declaration[1] of Caroline McGuire in Support of Defendants' Motion for Summary Judgement, dated December 10, 2023 (hereinafter "McGuire Decl.") as "Exhibit A."

       2.     Plaintiff alleges a federal false arrest claim against Detective Denis, Sergeant Wancique, and Inspector Bogle. See Amended Complaint, "Exhibit A," at ¶¶ 35 – 38.

       3.     Plaintiff alleges a federal malicious prosecution claim against Detective Denis, Sergeant Wancique, and Inspector Bogle. See Amended Complaint, "Exhibit A," at ¶¶ 39 – 42.

---

[1] Defendants submit this Rule 56.1 statement pursuant to Your Honor's Individual Rule IV(A)(2). Defendants will file their declaration and accompanying exhibits should the Court grant defendants leave to file their motion for summary judgment, or upon an earlier request from the Court.

4. Plaintiff alleges a federal malicious prosecution claim against Ms. Okezie and Ms. Simpson. See Amended Complaint, "Exhibit A," at ¶¶ 43 – 46.

5. Plaintiff alleges a Monell claim against the City of New York. See Amended Complaint, "Exhibit A," at ¶¶ 47 – 52.

6. Plaintiff alleges a federal First Amendment retaliation claim against Former Commissioner Shea. See Amended Complaint, "Exhibit A," at ¶¶ 53 – 58.

7. Plaintiff does not allege any other claims against any other individuals in his operative complaint. See Amended Complaint, "Exhibit A."

8. Plaintiff does not allege any state law claims. See Amended Complaint, "Exhibit A."

**Plaintiff's Criminal Prosecution**

9. On September 25, 2019, school guidance counselor Maryann Dumas received a report from the complaining victim, minor child B.M., that her neighbor dry humped her, grabbed her breasts, and tried to kiss her, after the neighbor's wife and children went to bed. See Investigative Log DD5, annexed to McGuire Decl., as "Exhibit B," at DEF 1557; See Detective Denis' Deposition (Denis Dep.), annexed to McGuire Decl., as "Exhibit C," at 52:06 – 52:16.

10. In this same complaint, B.M. also stated that her neighbor was a detective. See Investigative Log DD5, annexed to McGuire Decl., as "Exhibit B," at DEF 1557.

11. On September 25, 2019, Ms. Dumas reported B.M.'s disclosure to the police. See Investigative Log DD5, "Exhibit B," at DEF 1557.

12. Police Officer Riley conducted an investigation, and determined the plaintiff, former Detective Juan Jimenez, lived in B.M.'s building. See Investigative Log DD5, "Exhibit B," at DEF 1557.

13. Police Officer Riley notified the Internal Affairs Bureau of what he learned. See Investigative Log DD5, "Exhibit B," at DEF 1557.

14. The case was assigned to Detective Denis in Group 41 of Internal Affairs Bureau. See Investigative Log DD5, annexed to McGuire Decl., "Exhibit B," at DEF 1557; See Denis Dep., "Exhibit C," at 20:09 – 20:14.

15. On September 25, 2019, Detective Denis, and Sergeant Wancique went to the Brooklyn Child Abuse Center. See Denis Dep., "Exhibit C," at 18:22 – 19:11; 22:16 – 23:06.

16. On September 25, 2019, Administration for Child Services Child Protective Specialist Glory Okezie reported to the Brooklyn Child Abuse Center. See Glory Okezie Deposition (Okezie Dep.), annexed to McGuire Decl., as "Exhibit D," at 26:05 – 26:14.

17. On September 25, 2019 at around 10:00 P.M., Safe Horizons Forensic Interviewer Chrstine Fazio interviewed B.M. at the Brooklyn Child Advocacy Center. See Video of the Interview, annexed to McGuire Decl., as "Exhibit E."

18. A forensic interview of a child has four phases: rapport building with the child, interview instructions, narrative practice, and finally, transition to the topic of concern. See Christine Fazio Deposition (Fazio Dep.), annexed to McGuire Decl., as "Exhibit F," at 24:09 – 25:04.

19. Detective Denis, Sergeant Wancique and Child Protective Specialist Glory Okezie observed this interview, but did not participate in the interview. See Investigative Log DD5, annexed to McGuire Decl., "Exhibit B," at DEF 1609; See Video of the Interview, "Exhibit E."

20. During the interview instructions phase of B.M.'s forensic interview, when Ms. Fazio asked, "Do you feel like you can promise me to tell the truth?", B.M. responded, "I don't

3

know. I don't know. It depends what it is." See Video of the Interview, "Exhibit E," at 13:43 – 14:05. See Fazio Dep., "Exhibit F," at 25:05 – 25:10.

21. Ms. Fazio inquires further, "If you decide to answer a question, okay, do you promise the answer you give me will be true?", and Briana says, "I don't understand." See Video of the Interview, "Exhibit E," at 14:43 – 14:56.

22. Ms. Fazio continues, "Okay. So if I ask you a question, and you answer it, will the answer – do you promise the answer you give me will be true," to which B.M. responds, "Yes. Depending on what the question is. I'm not sure." See Video of the Interview, "Exhibit E," at 14:57 – 15:14.

23. Ms. Fazio continues, "So it's – will there be a time when you would tell me a lie or tell me not the truth?", and B.M. replies, "Yes, I am being honest." See Video of the Interview, "Exhibit E," at 15:14 – 15:20.

24. Ms. Fazio inquires further, "Thank you for being honest. Okay. What, what about telling the truth feels hard?" and B.M. answers, "I don't usually tell the truth but like I know it causes conflicts but it's just over my teachers of course. So like I have to tell the truth. But like sometimes I just tell them know if I want to. Like I'm not sure if I actually want to say that. It depends on what the question is." See Video of the Interview, "Exhibit E," at 15:20 – 15:51.

25. Ms. Fazio continues, "It depends on what the questions. Okay. So I accept that. I can't make you say one way or the other. I would only ask that, that, that if there's something you don't want to answer rather than telling me something that's not the truth, just tell me I don't wanna say that word," B.M. responded, "Uh-huh." See Video of the Interview, "Exhibit E," at 15:51 – 16:05.

4

26. Ms. Fazio verified, "Does that sound fair?" and B.M. stated, "Yes." See Video of the Interview, "Exhibit E," at 16:05 – 16:10.

27. B.M. stated that on one occasion, plaintiff grabbed her, hugged her, and asked B.M. to give him a kiss on the mouth. B.M. further stated, "And I was like no. It sounds like confusing shock so I didn't know to make jokes 'cause I made a joke so I was like no, 'cause your breath stinks. But yeah. And then he was, and then he just like kicked me out of his house. He just took me out of his house." See Video of the Interview, "Exhibit E," at 25:18 – 25:59.

28. B.M. further stated, "Oh, and he always grabs my butt for some reason. I don't know why but so he always asks me to help him with his daughter's homework. And so I bend down 'cause like the table is low like for little kids. And 'cause she's seven and the other ones so I have to help both of them and he just put his hand on my butt. That was weird…So yeah. And he always like grabs my butt, tries to pull my pants down. From the back. Not from the front. He never touched me like down there. He just tries to pull my pants down and I said no." See Video of the Interview, "Exhibit E," at 26:19 – 27:09.

29. B.M. continued, "He forces me to pull my pants down. And my bra. But I said no." See Video of the Interview, "Exhibit E," at 27:21 – 27:27.

30. Ms. Fazio inquired further, "Okay. What part of his body was grabbing your butt?" to which B.M. responded, "His hands." See Video of the Interview, "Exhibit E," at 29:23 – 29:28.

31. Ms. Fazio continues to state, "His hands. And what was, what was the hand doing on your butt? He was squeezing and then he just started to lean on it. He put his hands only on my butt. He just like moves it around." See Video of the Interview, "Exhibit E," at 29:28 – 29:41.

32. B.M. stated that she did not react to plaintiff touching her butt because she stated he is stronger than her. See Video of the Interview, "Exhibit E," at 29:55 – 30:05.

5

33. B.M. stated that on one occasion, plaintiff dry humped B.M. on his bed, with his clothes on; plaintiff was pushing B.M.. See Video of the Interview, "Exhibit E," at 31:46 – 32:51; 42:38 – 43:17.

34. B.M. stated that plaintiff kisses her. See Video of the Interview, "Exhibit E," at 33:26 – 32:47.

35. B.M. stated that on one occasion, plaintiff pulled her pants down and that her pants ripped while it happened. See Video of the Interview, "Exhibit E," at 33:49- 34:25.

36. B.M. stated that plaintiff started "grabbing her butt" when she was eleven years old. See Video of the Interview, "Exhibit E," at 50:11- 50:19.

37. B.M. stated that sometimes plaintiff pulls her pants down, that her underwear is also down too. See Video of the Interview, "Exhibit E," at 52:49- 53:10.

38. B.M. stated that plaintiff tried to pull her bra down and he was "squeezing [her] titties." See Video of the Interview, "Exhibit E," at 53:44 - 55:22.

39. B.M. stated that plaintiff gave her sneakers, toys and money. See Video of the Interview, "Exhibit E," at 59:05 – 1:00:28.

40. B.M. stated that plaintiff changes his clothes in front of her after plaintiff "finishes taking a bath." See Video of the Interview, "Exhibit E," at 1:02:01 – 1:03:16.

41. The interview concluded at approximately 11:22 P.M. on September 25, 2019. See Video of the Interview, "Exhibit E."

42. On September 27, 2019, B.M. identified plaintiff as the subject of the allegations in a confirmatory identification. See Investigative Log DD5, "Exhibit B," at DEF 1624.

43. On September 27, 2019, B.M. was interviewed at the Brooklyn District Attorney Office by Assistant District Attorney Mirabella. See Investigative Log DD5, "Exhibit B," at DEF

6

1626; See Excerpts of the Assistant District Attorney File (ADA File), annexed to McGuire Decl., as "Exhibit G," at DEF 2123; See Mirabella Deposition (Mirabella Dep.), annexed to McGuire Decl., as "Exhibit H," at 19:16 – 20:06.

44. Child Protective Specialist Okezie, Detective Denis, Sergeant Wancique, and Ms. Fazio were present during this interview. See ADA File, "Exhibit G," at DEF 2124.

45. Prior to conducting this interview, ADA Mirabella watched the video of the interview conducted by Ms. Fazio of B.M. that occurred at the Brooklyn Child Advocacy Center on September 25, 2019. See ADA File, "Exhibit G," at DEF 2124; See Mirabella Dep., "Exhibit H," at 16:02 – 19:15.

46. ADA Mirabella did not find it concerning that in the September 25, 2019 interview, the child states that she sometimes lies. See Mirabella Dep., "Exhibit H," at 17:03 – 18:07.

47. ADA Mirabella further explained that he did not find this concerning because "everybody lies to some degree," and that Ms. Fazio adequately addressed in the interview that if B.M. did not want to say something, she could decline to answer a question instead of stating a falsehood. See Mirabella Dep., "Exhibit H," at 18:16 – 19:11.

48. ADA Mirabella asked B.M. whether she understands the difference between a truth and a lie during the September 27, 2019 interview. See Mirabella Dep., "Exhibit H," at 25:03 – 25:07.

49. ADA Mirabella was satisfied with B.M.'s answers as to whether she understood the difference between a truth and a lie. See Mirabella Dep., "Exhibit H," at 25:08 – 25:10.

50. B.M.'s disclosure during the her interview with ADA Mirabella was consistent with her interview on September 25, 2019. See Mirabella Dep., "Exhibit H," at 21:14 – 21:17; See ADA File, "Exhibit G," at DEF 2124 – DEF 2126.

51. B.M.'s interview with ADA Mirabella took place before plaintiff was arrested. See Denis Dep., "Exhibit C," at 100:10 – 100:17.

52. Plaintiff was arrested on September 27, 2019. See ADA File, "Exhibit G," at DEF 1926 – DEF 1928; DEF 2125 – DEF 2126.

53. Plaintiff was arrested for Sexual Abuse in the First Degree, Forcible Touching, Endangering the Welfare of a Child, and Sexual Abuse of a Minor in the Second Degree. See ADA File, "Exhibit G," at DEF 1926 – DEF 1928.

54. Sergeant Wancique was plaintiff's arresting officer. See ADA File, "Exhibit G," at DEF 1926 – DEF 1928.

55. Former Chief of Criminal Investigations Alan Cooper instructed Deputy Inspector Bogle to arrest plaintiff. See Former Chief Alan Cooper's Deposition (Cooper Dep.), annexed to McGuire Decl., as "Exhibit I," at 22:13 – 22:19; See Investigative Log DD5, annexed to McGuire Decl., as "Exhibit B," at DEF 1569.

56. At the time of plaintiff's arrest, the Kings County District Attorney's Office indicated they would criminally prosecute plaintiff. See Cooper Dep., "Exhibit I," at 22:13 – 22:19; 42:03 – 43:13; See Mirabella Dep., "Exhibit H," at 23:17 – 24:25.

57. On September 27, 2019, was charged with Sexual Abuse in the First Degree, Forcible Touching, Endangering the Welfare of a Child, and Sexual Abuse of a Minor in the Second Degree. See ADA File, "Exhibit G," at DEF 2106.

58. On September 27, 2019, Detective Denis signed the criminal Court complaint. See ADA File, "Exhibit G," at DEF 2106.

59. On September 27, 2019, plaintiff was arraigned, and issued an order of protection against B.M. See ADA File, "Exhibit G," at DEF 2125 – DEF 2126.

60. After plaintiff was arraigned, he was released with a limited order of protection. See Plaintiff's Deposition (Pl. Dep.) annexed to McGuire Decl., as "Exhibit J" at 107:18 – 107:20.

61. A grand jury did not indict plaintiff on the charges of sexual abuse. See Denis Dep., "Exhibit C," at 89:03 – 89:06; See Investigative Log DD5, "Exhibit B," at DEF 1766.

62. Plaintiff's criminal case was dismissed on or about March 26, 2020. See Investigative Log DD5, "Exhibit B," at DEF 1766.

**Plaintiff's Family Court Case**

63. Glory Okezie was Child Protective Specialist in September, 2019. See Okezie Dep., "Exhibit D, " at 24:02 – 24:13.

64. Ms. Simpson was Ms. Okezie's supervisor in September, 2019. See Okezie Dep., "Exhibit D, " at 24:17 – 24:22.

65. On September 25, 2019, Administration for Child Services ("ACS") was notified about the minor child B.M.'s allegations of sexual abuse against plaintiff. See Excerpts of the Administration for Child Services ("ACS") Investigation (hereinafter ACS Investigation), annexed to McGuire Decl., as "Exhibit K" at DEF 928.

66. On September 25, 2019, Ms. Simpson assigned Ms. Okezie the case of the minor child B.M. See Okezie Dep., "Exhibit D, " at 24:02 – 24:22; See ACS Investigation, "Exhibit K," at DEF 928.

67. On September 25, 2019, Ms. Okezie went to the minor child B.M.'s home. See Okezie Dep., "Exhibit D, " at 25:05 – 25:16; See ACS Investigation, "Exhibit K," at DEF 929.

68. When Ms. Okezie reached the minor child's building, she interviewed two neighbors. See ACS Investigation, "Exhibit K," at DEF 929.

69. Ms. Okezie also interviewed the family during a home visit on September 25, 2019. <u>See</u> ACS Investigation, "Exhibit K," at DEF 929 – DEF 947.

70. Ms. Okezie attended the forensic interview of minor child B.M. at the Brooklyn Child Advocacy Center on September 25, 2019. <u>See</u> Okezie Dep., "Exhibit D," at 26:05 – 26:14.

71. During this interview, B.M. disclosed that plaintiff sexually abused her. <u>See</u> Okezie Dep., "Exhibit D," at 80:10 – 80:24; <u>See</u> ACS Investigation, "Exhibit K," at DEF 935; <u>See</u> Video of the Interview, "Exhibit E."

72. On October 1, 2019, ACS hosted a Child Safety Conference regarding the allegations of the minor child B.M. <u>See</u> Child Safety Conference Sheet, annexed to McGuire Decl., as "Exhibit L," at DEF 1909 – DEF 1911.

73. Ms. Simpson, Ms. Okezie, and the minor child B.M.'s parents, Jorge Mendez and Gilda Inoa, attended this conference. <u>See</u> Child Safety Conference Sheet, "Exhibit L," at DEF 1911.

74. At the conclusion of this conference, the "safety intervention recommended" was for ACS to file an Article 10 Petition against plaintiff, and to obtain a full order of protection against plaintiff. O.M. <u>See</u> Child Safety Conference Sheet, "Exhibit L," at DEF 1910.

75. On October 1, 2019, ACS hosted a Child Safety Conference regarding how the allegations of the minor child B.M. may affect plaintiff's own children. <u>See</u> Child Safety Conference Sheet, "Exhibit L," at DEF 1912 – DEF 1914.

76. Ms. Simpson, Ms. Okezie, plaintiff, and plaintiff's wife attended this conference. <u>See</u> Child Safety Conference Sheet, "Exhibit L," at DEF 1914.

77. At the conclusion of this conference, the "safety intervention recommended" was for ACS to file an Article 10 Petition against plaintiff for his own children, I.J. and R.J. See Child Safety Conference Sheet, "Exhibit L," at DEF 1914.

78. The Family Court Legal Services Team files Article 10 Petitions. See Okezie Dep., "Exhibit D, " at 98:02 – 98:09; See Vivene Simpson Deposition (Simpson Dep.), annexed to McGuire Decl., as "Exhibit M," at 85:02 – 85:05.

79. The Family Court Legal Team filed an Article 10 petition against plaintiff on behalf of the minor child, B.M. See Pl. Dep., "Exhibit J" at 112:23 – 112:04; See ACS Investigation, "Exhibit K," at DEF 1101.

80. On October 1, 2019, Counsel for ACS Lindsay Egan filed an Article 10 petition against plaintiff on behalf of his own minor child, I.J. See Article 10 Petition on Behalf of Minor Child I.J. ("Article 10 I.J."), annexed to McGuire Decl., as "Exhibit N," at DEF 712.

81. Ms. Okezie was the deponent on the Article 10 petition on behalf of minor child, I.J. See Article 10 I.J., "Exhibit N," at DEF 713 – DEF 715.

82. On October 1, 2019, Counsel for ACS Lindsay Egan filed an Article 10 petition against plaintiff on behalf of his own minor child, R.J. See Article 10 Petition on Behalf of Minor Child R.J. ("Article 10 R.J."), annexed to McGuire Decl., as "Exhibit O," at DEF 706.

83. Ms. Okezie was the deponent on the Article 10 petition on behalf of minor child, R.J. See Article 10 R.J., "Exhibit O," at DEF 707 – DEF 709.

84. On or about October 3, 2019, plaintiff's minor children I.J. and R.J. were forensically interviewed at the Brooklyn Child Advocacy Center. See ACS Investigation, "Exhibit K," at DEF 979 – DEF 990.

11

85. Plaintiff's own children, I.J. and R.J., did not make a disclosure of sexual abuse against plaintiff. See Simpson Dep., "Exhibit M," at 36:12 – 36:19; See ACS Investigation, "Exhibit K," at DEF 983, DEF 1239; See Okezie Dep., "Exhibit D," at 100:03 – 100:08.

86. The Article 10 petitions filed on behalf of plaintiff's own minor children, I.J. and R.J., were derivative of the pending allegation of the minor child B.M. See Simpson Dep., "Exhibit M," at 41:17 – 42:03; 43:18 – 43:23; See Okezie Dep., "Exhibit D," at 110:13 – 111:16; See ACS Investigation, "Exhibit K," at DEF 988.

87. The purpose of filing Article 10 petitions on behalf of plaintiff's own children, I.J. and R.J., as derivative of B.M.'s allegations, was to ensure the safety and the wellbeing of those children. See Okezie Dep., "Exhibit D," at 110:13 – 111:16; See Simpson Dep., "Exhibit M," at 38:22 – 39:08; 39:16 – 40:07; 40:14 – 42:03; See Article 10 R.J., "Exhibit O," at DEF 709; See Article 10 I.J., "Exhibit N," at DEF 715.

88. On December 17, 2019, the Court denied an application to dismiss the case on behalf of plaintiff's derivative children. See ACS Investigation, "Exhibit K," at DEF 1158.

89. On September 20, 2020, the Honorable Ben Darvil Jr. dismissed the Article 10 petitions filed on behalf of I.J. and R.J. without prejudice because the petitions were withdrawn. See Article 10 Dismissal on Behalf of Minor Children I.J. and R.J. ("Article 10 Dismissal"), annexed to McGuire Decl., as "Exhibit P," at P 1151 – P 1152.

90. Ms. Simpson did not view the video of the minor child's forensic interview on September 25, 2019, until deposition preparation in this case. See Simpson Dep., "Exhibit M," at 85:15 – 85:18.

91. Ms. Simpson did not change her view of the case upon seeing the video because, "the child, who's our client, minor child, made an outcry and it's the agency's policy to ensure

ongoing safety and things be put in place to ensure no future harm." See Simpson Dep., "Exhibit M," at 85:19 – 86:03.

**Plaintiff's Dismissal from the New York City Police Department**

92. Plaintiff went to departmental trial for the sexual abuse allegations of the minor child B.M. and for representing himself as a detective to gain information on a personal matter. See Excerpts of Plaintiff's Personnel File (Pl. Personnel File), annexed to McGuire Decl., as "Exhibit Q," at DEF 012, DEF 014.

93. Plaintiff's departmental trial commenced on July 6, 2021. See Pl. Personnel File, Exhibit Q, at DEF 012.

94. On or about November 6, 2020, Plaintiff went to a children's trampoline gym, BounceU and requested his attendance record. See Pl. Personnel File, as "Exhibit Q," at DEF 003, DEF 015, DEF 036; See Pl. Dep., Exhibit J, at 73:08 – 73:22.

95. When plaintiff requested his attendance record, he was suspended with pay. See Pl. Personnel File, as "Exhibit Q," at DEF 046, DEF 047; See Pl. Dep., Exhibit J, at 78:10 – 78:13.

96. Plaintiff represented himself as a detective when he requested his attendance record from BounceU. See Pl. Personnel File, as "Exhibit Q," at DEF 003, DEF 036, DEF 046, DEF 047; See Pl. Dep., Exhibit J, at 71:14 – 71:16.

97. In a separate incident, plaintiff also was disciplined for Abuse of Authority. See Excerpts of CCRB Case 201710514 (2017 CCRB Case), annexed to McGuire Decl., as "Exhibit R," at DEF 070 – DEF 071.

98. In this aforementioned separate incident, on December 18, 2017, plaintiff saw a

group of five youths, and plaintiff believed he recognized these individuals from security footage that captured an assault of his elderly father. See 2017 CCRB Case, "Exhibit R," at DEF 074; See Pl. Dep., Exhibit J, at 64:05 – 65:18.

99. Plaintiff was off duty when he made this observation. See 2017 CCRB Case, "Exhibit R," at DEF 166.

100. Plaintiff followed the youths into 227 Sullivan Place, instructed them to get on the floor and show him their hands. See 2017 CCRB Case, "Exhibit R," at DEF 074.

101. Plaintiff pointed his gun at the youths. See 2017 CCRB Case, "Exhibit R," at DEF 074.

102. Plaintiff was disciplined for this incident for abuse of authority, and force, and lost 30 vacation days. See 2017 CCRB Case, "Exhibit R," at DEF 071 – DEF 072.  See Pl. Dep., Exhibit J, at 67:08 – 68:15.

103. The Assistant Deputy Commissioner of Trials, the Honorable Nancy R. Ryan, issued a decision on August 23, 2021. See Pl. Personnel File, as "Exhibit Q," at DEF 013.

104. At the conclusion of plaintiff's departmental trial for the underlying incident, Judge Ryan found plaintiff be found "not guilty" of the sexual abuse allegations of a minor. See Pl. Personnel File, as "Exhibit Q," at DEF 012, DEF 014.

105. At the conclusion of plaintiff's departmental trial for this underlying incident, Judge Ryan found plaintiff "guilty" of representing himself as a detective to gain information on a personal matter, when he was suspended with pay. See Pl. Personnel File, as "Exhibit Q," at DEF 012, DEF 014.

106. The trial judge recommended that plaintiff forfeit ten vacation days as a result of this violation. See Pl. Personnel File, as "Exhibit Q," at DEF 014.

107. Police Commissioner Dermot Shea reviewed Judge Ryan's findings. See Pl. Personnel File, as "Exhibit Q," at DEF 002 – DEF 004.

108. Commissioner Shea approved of the trial judge's findings, but disagreed with the penalty. See Pl. Personnel File, as "Exhibit Q," at DEF 003; See Pl. Dep., Exhibit J, at 56:18 – 57:03.

109. Police Commissioner Shea found that, "on two separate occasions, Detective Jimenez took police related actions in matters already under investigation and in which he or his family members were personally involved…It is clear from the record and Detective Jimenez's disciplinary history that his repeated actions concerning off-duty involvement in police related matters, in which he or his family members are personally involved, necessitates a greater and more serious penalty." See Pl. Personnel File, as "Exhibit Q," at DEF 003.

110. Police Commissioner Shea determined that Detective Jimenez should be dismissed from the force after consideration of the "the totality of the issues and circumstances in this matter regarding the misconduct for which Detective Juan Jimenez has been found guilty, as well as Detective Jimenez's overall discipline history…" See Pl. Personnel File, as "Exhibit Q," at DEF 004.

111. On November 15, 2021 plaintiff was dismissed as a detective from the New York City Police Department. See Pl. Personnel File, as "Exhibit Q," at DEF 001.

112. Plaintiff has no documentation from the New York City Police Department that demonstrates his dismissal was predicated on plaintiff's interview to a news outlet. See Pl. Dep., Exhibit J, at 56:13 – 56:17.

113. Plaintiff did not participate in a 50-h hearing regarding this lawsuit. See Pl. Dep., Exhibit J, at 82:22 – 82:23.

Dated: New York, New York
April 5, 2023

              HON SYLVIA O. HINDS RADIX
              Corporation Counsel of the
                City of New York
              *Attorney for Defendants*
              100 Church Street
              New York, New York 10007
              (212) 356-5052

By: /s/ *Caroline McGuire*
    Caroline McGuire
    Assistant Corporation Counsel
    Special Federal Litigation

To: **VIA EMAIL**
   Eric Sanders, Esq.
   esanders@thesandersfirmpc.com
   *Attorney for Plaintiff*