UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x

JUAN J. JIMENEZ,

                Plaintiff,

        v.

CITY OF NEW YORK, HUGH BOGLE,
DERBY WANCIQUE,[1] PASCALE
DENIS, VIVENE SIMPSON, GLORY
OKEZIE, and DERMOT F. SHEA,

              Defendants.

----------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CV-6133 (RPK) (JRC)

RACHEL P. KOVNER, United States District Judge:

      Plaintiff Juan J. Jimenez filed this lawsuit under 42 U.S.C. § 1983 alleging false arrest, malicious prosecution, and retaliation in violation of the First Amendment. Defendants have moved for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

### I.   Factual Background

      The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

#### A.  Plaintiff's Arrest and Criminal Prosecution

      In September 2019, B.M., a twelve-year-old child, reported to her school guidance counselor that her neighbor had assaulted her in his apartment after the neighbor's wife and children went to bed. Pl.'s Rule 56.1 Counterstatement ¶ 9 (Dkt. #52); Decl. of Caroline McGuire (Dkt. #50), Ex. B ("Investigative Log") 14 (ECF Pagination) (Dkt. #50-2). According to B.M.'s

---

[1] Plaintiff's complaint spells defendant Derby Wancique's last name "Wanccique." Am. Compl. 1 (Dkt. #15). But because defendant's summary judgment brief uses "Wancique," Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' MSJ") 1 (Dkt. #49), I adopt that spelling.

guidance counselor, B.M. reported that her neighbor "pinned her on the couch and stated, 'I'm going to [d]ry [h]ump you,'" "reached under her shirt and grabbed her breast," and "tried to kiss her."   Investigative Log 14.   B.M. also told her guidance counselor that her neighbor was a detective.  *Ibid.*; Pl.'s Rule 56.1 Counterstatement ¶ 10.  After the guidance counselor reported B.M.'s disclosure to the police, the police confirmed that plaintiff was a detective for the New York City Police Department ("NYPD") and lived in B.M.'s apartment building.  Pl.'s Rule 56.1 Counterstatement ¶¶ 11–12.

That same day, a forensic specialist interviewed B.M. at the Brooklyn Child Advocacy Center.  *Id.* ¶ 17.  NYPD Detective Pascale Denis and NYPD Sergeant Derby Wancique observed, but did not participate in, the interview.  *Id.* ¶ 19.  Glory Okezie, a Child Protective Specialist with the Administration for Child Services ("ACS"), also observed the interview.  *Ibid.*

During the interview, the forensic specialist asked B.M. questions about her ability to tell the truth.  When she first asked B.M. whether she could "promise . . . to tell the truth," B.M. responded that she "d[idn't] know."  *Id.* ¶ 20.  The forensic specialist then asked whether she "promise[d] the answer [she] give[s] . . . will be true," to which B.M. responded that she didn't understand.  *Id.* ¶ 21.  The forensic interviewer repeated: "[D]o you promise the answer you give me will be true?"  *Id.* ¶ 22.  B.M. then answered: "Yes.  Depending on what the question is.  I'm not sure."  *Ibid.*  The forensic interviewer then asked: "[W]ill there be a time when you would tell me a lie or tell me not the truth?"  *Id.* ¶ 23.  B.M. responded: "Yes, I am being honest."  *Ibid.*

The forensic interviewer continued asking B.M. questions about telling the truth.  Specifically, she asked B.M. "what about telling the truth feels hard."  *Id.* ¶ 24.  B.M. responded: "I don't usually tell the truth but like I know it causes conflicts but it's just over my teachers of course.  So like I have to tell the truth.  But like sometimes I just tell them [no] if I want to.  Like

I'm not sure if I actually want to say that.  It depends on what the question is."  *Ibid.*  The forensic interviewer then stated: "I would only ask that . . . if there's something you don't want to answer rather than telling me something that's not the truth, just tell me I don't wanna say that word."  *Id.* ¶ 25.  B.M. responded: "Uh-huh."  *Ibid.*  Finally, the forensic interviewer asked whether that sounded "fair," and B.M. responded "[y]es."  *Id.* ¶ 26.

The forensic interviewer proceeded to ask B.M. questions about plaintiff.  *See id.* ¶¶ 27–40.  In their Rule 56.1 statements, the parties agree that B.M. made the following allegations against plaintiff[2]:

- B.M. stated that on one occasion, plaintiff grabbed her, hugged her, and asked her to give him a kiss on the mouth.  *Id.* ¶ 27.
- B.M. stated that plaintiff "always grabs [her] butt" and "tries to pull [her] pants down" when she helps his children with their homework.  *Id.* ¶ 28.
- B.M. stated that plaintiff "forces [her] to pull [her] pants down" and "[her] bra."  *Id.* ¶ 29.
- B.M. stated that on one occasion plaintiff "dry humped" her on his bed.  *Id.* ¶ 33.
- B.M. stated that plaintiff kisses her.  *Id.* ¶ 34.
- B.M. stated that on one occasion, plaintiff pulled her pants down and that her pants ripped while it happened.  *Id.* ¶ 35.
- B.M. stated that plaintiff started "grabbing her butt" when she was eleven years old.  *Id.* ¶ 36.
- B.M. stated that when plaintiff pulls her pants down, her underwear is sometimes down too.  *Id.* ¶ 37.
- B.M. stated that plaintiff tried to pull her bra down and groped her.  *Id.* ¶ 38.
- B.M. stated that plaintiff changes his clothes in front of her after he "finishes taking a bath."  *Id.* ¶ 40.

Plaintiff was arrested and charged with first-degree sexual abuse, forcible touching, endangering the welfare of a child, and second-degree sexual abuse of a minor.  *Id.* ¶¶ 53, 57.  NYPD Deputy Inspector Hugh Bogle was instructed to arrest plaintiff.  *Id.* ¶ 55.  An arrest report also lists Sergeant Wancique as the arresting officer.  *Id.* ¶ 54.

---

[2] Defendants have also submitted a video of B.M.'s interview.  But "[a] court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements." *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 46 (2d Cir. 2005) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).  I therefore consider only the statements from B.M.'s interview that the parties identified in their Rule 56.1 statements.

The District Attorney's Office filed a criminal complaint against plaintiff, which was signed by Detective Denis. *Id.* ¶ 58. Plaintiff was arraigned, and an order of protection limiting his contact with B.M. was issued. *Id.* ¶¶ 59–60. A grand jury ultimately declined to indict plaintiff, and the District Attorney's Office dismissed the criminal charges against him. *Id.* ¶¶ 61–62.

### B. Family Court Proceedings

On the same day that B.M. made her accusation to her guidance counselor, ACS opened an investigation. *See id.* ¶ 65. As part of the investigation, Ms. Okezie both attended B.M.'s interview at the Brooklyn Child Advocacy Center and spoke to B.M.'s neighbors and family. *Id.* ¶¶ 68–70.

A few days after the investigation commenced, ACS hosted a child safety conference. *Id.* ¶ 72. Ms. Okezie and her supervisor, Vivene Simpson, attended, as did B.M.'s parents. *Id.* ¶¶ 64, 73. At the conclusion of the conference, a representative of ACS indicated that ACS would file a petition on behalf of B.M. pursuant to Article 10 Of the New York Family Court Act. *See id.* ¶ 74. An Article 10 petition initiates a proceeding in family court based on "facts sufficient to establish that a child is abused or neglected." N.Y. Fam. Ct. Act. § 1031. A representative of ACS further indicated it would seek an order of protection against plaintiff on behalf of B.M. Pl.'s Rule 56.1 Counterstatement ¶ 74.

The same day, ACS hosted another child safety conference, this time with Ms. Simpson, Ms. Okezie, plaintiff, and plaintiff's wife. *Id.* ¶ 76. Although plaintiff's children had not themselves made any allegations of abuse against plaintiff, *id.* ¶ 85, at the conclusion of the conference, a representative of ACS indicated that ACS would file additional Article 10 petitions against plaintiff on behalf of plaintiff's two children, *id.* ¶ 77.

Lawyers at ACS then filed three Article 10 petitions against plaintiff, one on behalf of B.M.

and two on behalf of plaintiff's children. *Id.* ¶¶ 79–83. Ms. Okezie was listed as the deponent on the petitions for plaintiff's children. *Id.* ¶¶ 81, 83. The record does not indicate whether any ACS official was listed as a deponent on the petition for B.M. *See id.* ¶¶ 79–83.

After ACS filed the Article 10 petitions, plaintiff's two children reported to Brooklyn Child Advocacy Center for forensic interviews. *Id.* ¶ 84. Neither of plaintiff's children made any allegations against him during the interviews. *Id.* ¶ 85.

Several months later, ACS withdrew the Article 10 petitions for plaintiff's children, and a family court judge dismissed those petitions without prejudice. *Id.* ¶ 89. The record does not indicate whether or how the Article 10 petition for B.M. was resolved. *See ibid.*

### C. Plaintiff's Dismissal from the NYPD

After B.M. made her accusation against plaintiff, the NYPD suspended plaintiff's employment. *See id.* ¶ 95. At some point during plaintiff's suspension, B.M. alleged that plaintiff violated the order of protection against her by taking her to an indoor trampoline park. Decl. of Caroline McGuire, Ex. Q ("Pl.'s Personnel File") 10 (ECF Pagination) (Dkt. #50-16). An emergency court session was held, during which plaintiff denied violating the order. *See ibid.* While on a break from the court session, plaintiff went to the trampoline park and requested his record of attendance. *Ibid.* Defendants allege that plaintiff represented himself as a detective when requesting this evidence, though plaintiff denies doing so. Pl.'s Rule 56.1 Counterstatement ¶ 96.

The NYPD brought disciplinary charges against plaintiff. *See* Pl.'s Personnel File 7. Specifically, the NYPD charged plaintiff with "us[ing] his hand to touch the buttocks" of a minor and "represent[ing] himself as an on-duty" officer "to gain information regarding . . . his own personal matter unrelated to" the NYPD. *Id.* at 8.

At a disciplinary hearing, an Assistant Deputy Commissioner found plaintiff not guilty of touching a minor inappropriately but guilty of wrongfully representing himself as an on-duty officer.   Pl.'s Rule 56.1 Counterstatement ¶ 104.   The Assistant Deputy Commissioner recommended that the NYPD require plaintiff to forfeit ten vacation days.  *Id.* ¶ 106.

NYPD Commissioner Dermot Shea reviewed the Assistant Deputy Commissioner's report and recommendation.  Pl.'s Personnel File 3.  Commissioner Shea declined to adopt the Assistant Deputy Commissioner's recommendation and instead dismissed plaintiff from the NYPD.  *Id.* at 5.  Commissioner Shea noted that plaintiff had previously "conducted an investigation, while off-duty, concerning a matter in which he was personally involved."  *Id.* at 4.  Commissioner Shea was referring to a separate incident in which plaintiff, while off-duty, stopped and held at gunpoint five teenagers who he believed to be involved in an assault against his father.  Pl.'s Rule 56.1 Counterstatement ¶¶ 98–101.

Prior to his dismissal from the NYPD, plaintiff filed a claim with the New York City Comptroller's Office, alleging that he had been falsely arrested and wrongly subjected to Article 10 petitions for child abuse and neglect.  *Id.* ¶ 107.  He also granted an interview to the New York Daily News, again complaining that he had been falsely arrested, and both the New York Daily News and the New York Post published stories about his arrest.  *Id.* ¶ 109.

## II.     Procedural Background

Plaintiff filed this lawsuit under 42 U.S.C. § 1983 against Deputy Inspector Bogle, Sergeant Wancique, Detective Denis, Ms. Simpson, Ms. Okezie, Commissioner Shea, and the City of New York.  *See* Am. Compl. (Dkt. #15).  He brings false arrest and malicious prosecution claims pertaining to his arrest and prosecution on criminal charges against Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis.  *Id.* ¶¶ 35–42.  He also claims that Ms. Simpson and Ms.

Okezie "maliciously prosecuted him in Family Court with legally baseless Article 10 petitions." *Id.* ¶ 45; *see id.* ¶¶ 43–46.  In addition, he brings a First Amendment retaliation claim against Commissioner Shea, alleging that Commissioner Shea fired him for complaining of wrongful arrest and related police misconduct.  *Id.* ¶¶ 53–58; *see id.* ¶ 34.  Finally, plaintiff claims that the City of New York is liable for his arrest, criminal prosecution, and family court proceedings under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Am. Compl. ¶¶ 47–52.

Defendants have moved for summary judgment on all claims.  *See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' MSJ") (Dkt. #49).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Ibid.*  The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether there is a genuine issue of material fact, I evaluate the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant.  *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010).  "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotation marks, alteration, and citation omitted).  A nonmoving

7

party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In other words, "[t]he litigant opposing summary judgment . . . may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d. Cir. 1980) (quotation marks and citation omitted).

## DISCUSSION

Defendants' motion for summary judgment is granted.

## I. Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis Are Entitled to Qualified Immunity for False Arrest and Malicious Prosecution.

Qualified immunity shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability on plaintiff's false arrest and malicious prosecution claims, because at least arguable probable cause supported plaintiff's arrest and criminal prosecution.

As a general matter, probable cause at the time of arrest is a complete defense to a claim of false arrest, *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014), and to a claim of malicious prosecution so long as there is no "indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest," *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 226 (E.D.N.Y. 2010) (quotation marks and citation omitted); *see ibid.* ("Plaintiff has . . . failed to dissipate the probable cause that was present at the time of his arrest, and . . . therefore . . . there was also probable cause for [his prosecution].")*; Betts*, 751 F.3d at 82.

Probable cause exists in the false arrest context when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested," *Fabrikant v. French*, 691

8

F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)), and exists in the malicious prosecution context under the "essentially . . . same" inquiry "in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest," *Danielak v. City of New York*, No. 02-CV-2349 (KAM), 2005 WL 2347095, at *10 (E.D.N.Y. Sept. 26, 2005) (quotation marks and citation omitted), *aff'd*, 209 F. App'x 55 (2d Cir. 2006).

Qualified immunity, in turn, shields officers from liability for false arrest under Section 1983 so long as "arguable probable cause" existed "to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (quotation marks omitted) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). And qualified immunity provides the same shield against claims of malicious prosecution so long as no "intervening fact" caused the "arguable probable cause" justifying the arrest to "dissipate" before the criminal proceeding was commenced. *Gaston v. City of New York*, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012) (quotation marks omitted) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Arguable probable cause exists if either (i) "it was objectively reasonable for the officer to believe that probable cause existed," or (ii) "officers of reasonable competence could disagree on whether the probable cause test was met." *Myers*, 819 F.3d at 633 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)).

The Second Circuit's recent application of these principles in *Doe v. Pisani*, No. 21-2847, 2023 WL 4240987 (2d Cir. June 29, 2023), indicates that arguable probable cause can exist in child sex-abuse cases even when there is a possible reason to question the account of the child reporting the abuse. The defendant officers in *Pisani* arrested a parent based on abuse allegations from his daughter and son, which the children made first to the children's mother and then to state investigators. The Second Circuit found the children's "firsthand accounts of their alleged abuse, which were largely consistent with a sworn statement from their mother" recounting the allegations

the children made to her were "sufficient to establish arguable probable cause," notwithstanding one of the children's "various recantations," the plaintiff's "protestations of innocence, and the opinions of various mental health professionals that [the plaintiff] did not molest the children." *Id.* at \*4. The Court explained that those pieces of evidence "establish[ed] only 'conflicting accounts,' which do not negate arguable probable cause 'where an . . . officer chose to believe' one credible account over others." *Ibid.* (citation omitted). The Court relied in part on *Smith v. Edwards*, 175 F.3d 99 (2d Cir. 1999), which it described as finding probable cause "where a child reported sexual abuse to her mother and various others and her mother provided a sworn statement confirming the same." *Pisani*, 2023 WL 4240987, at \*4 (citing *Smith*, 175 F.3d at 106). Granting qualified immunity at the summary judgment stage, the Court concluded it was not possible to "say that *no* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that probable cause existed." *Ibid.* (quotation marks, alteration, and citation omitted).

The principles in *Pisani* indicate that plaintiff's arrest and prosecution were similarly supported by probable cause. Like the child complainants in *Pisani*, the child complainant here made several reports of sexual abuse, which were largely consistent with each other. B.M. first reported to her guidance counselor that plaintiff pinned her to his couch, told her he would assault her, grabbed her breast, and tried to kiss her. *See* Investigative Log 14. B.M. then stated in her forensic interview that plaintiff had grabbed her and tried to kiss her, *see* Pl.'s Rule 56.1 Counterstatement ¶ 27, and that he had assaulted her on his bed, *see id.* ¶ 33. Notwithstanding minor variations, those reports were mostly consistent with one another. Plaintiff argues that the officers were not entitled to credit B.M.'s disclosures because she admitted in her forensic interview to sometimes lying. Pl.'s Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s

Opp'n") 4 (Dkt. #51). But *Pisani* indicates that "largely consistent" accounts from a child sex-abuse complainant can be "sufficient to establish arguable probable cause," even where some questions exist as to the reliability of the complainant's statements. *Pisani*, 2023 WL 4240987, at *4. Taking into consideration both B.M.'s colloquy with her interviewer regarding telling the truth, and B.M.'s detailed and consistent account of sexual abuse, it is not possible to conclude that "*no* reasonable officer . . . *could have* determined that probable cause existed." *Ibid.* (quotation marks, alteration, and citation omitted).

Because "arguable probable cause" existed, *Myers*, 819 F.3d at 632 (quotation marks and citation omitted), qualified immunity shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability for false arrest. And because plaintiff points to no "intervening fact" causing the "arguable probable cause" to "dissipate" before the criminal prosecution against him commenced, *Gaston*, 851 F. Supp. 2d at 793, qualified immunity likewise shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability for malicious prosecution.

## II.   Ms. Simpson and Ms. Okezie Are Entitled to Qualified Immunity for Malicious Prosecution.

Qualified immunity also shields Ms. Simpson and Ms. Okezie from liability on plaintiff's claim that those defendants "maliciously prosecuted him in [f]amily [c]ourt" by filing "legally baseless" Article 10 petitions. Am. Compl. ¶ 45.

Qualified immunity attaches "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam) (quotation marks and citation omitted). While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). Courts

may "grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Booker v. Graham*, 974 F.3d 101, 106 (2d Cir. 2020) (citation omitted).

Qualified immunity forecloses plaintiff's malicious-prosecution claim based on Article 10 petitions, because as plaintiff himself acknowledges, it is not clearly established within the Second Circuit that such petitions "can give rise to a federal claim for malicious prosecution of a parent." *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015); *see* Pl.'s Opp'n 7 ("It is not settled in the Second Circuit whether the initiation of child neglect proceedings can give rise to a malicious prosecution claim.").   Because federal malicious-prosecution claims arise under the Fourth Amendment, a plaintiff claiming malicious prosecution must show "some deprivation of liberty consistent with the concept of 'seizure.'" *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)).   The Second Circuit has held that, at a minimum, it is not clearly established that a parent suffers such a deprivation when an abuse or neglect petition is brought against him.   *Dabah v. Franklin*, No. 22-845, 2023 WL 3577872, at *4 (2d Cir. May 23, 2023).   While a parent has standing to assert an unlawful seizure claim on behalf of a child who was "seized" by the state through a proceeding involving child custody, the Second Circuit has "never recognized any . . . independent Fourth Amendment right of the parent" in the context of a child custody proceeding.   *Ibid*.   Indeed, in the unpublished decision in *Dabah*, the Second Circuit stated that it read its prior decisions as "entirely foreclos[ing]" a parent from raising a malicious prosecution claim arising out of child-neglect proceedings on his own behalf.   *Ibid.* (discussing *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012)).   As in *Dabah*, because plaintiff asserts malicious prosecution claims on his own behalf, *see* Am. Compl. ¶¶ 43–46, Ms. Okezie and Ms. Simpson are "at a minimum . . .

entitled to qualified immunity" on plaintiff's claims against them, *Dabah*, 2023 WL 3577872, at *4.

### III.   Commissioner Shea Is Entitled to Summary Judgment on Plaintiff's First Amendment Claim.

Plaintiff's First Amendment retaliation claim against Commissioner Shea fails because plaintiff has not put forth evidence from which a reasonable jury could infer that Commissioner Shea fired plaintiff in retaliation for protected speech—namely, plaintiff's filing of a complaint with the New York City Comptroller's Officer and his interview with a member of the press.  *See* Am. Compl. ¶¶ 32–33, 53–58.  To succeed on a First Amendment retaliation claim under Section 1983, a plaintiff "must demonstrate by a preponderance of the evidence that the [speech or conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [speech or conduct] and the adverse employment action."  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (quotation marks omitted) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)).

Plaintiff has not set out evidence from which a jury could find a causal connection between his complaint and interviews and his termination from the NYPD, because he has not put forward evidence that "it is at least plausible that [Commissioner Shea was] aware of" his protected speech "and that [the plaintiff's firing] was motivated by" that speech.  *Odermatt v. N.Y.C. Dep't of Educ.*, 694 F. App'x 842, 845 (2d Cir. 2017).  The only evidence of a causal connection that plaintiff identifies is the short period of time that elapsed between the allegedly protected speech and his termination.  *See* Pl.'s Opp'n 12–13.  Specifically, Commissioner Shea terminated plaintiff's employment seventeen days after plaintiff filed his complaint and sixteen days after the New York Daily News published a story for which plaintiff was interviewed.  *Ibid.*  But "while factfinders can infer a causal connection from the temporal proximity of protected speech to a challenged

employment action, that inference is only permissible if there is reason to believe that the decisionmakers taking the allegedly retaliatory action were aware of the plaintiff's protected speech." *Schulz v. Commack Union Free Sch. Dist.*, No. 21-CV-5646 (RPK) (ST), 2023 WL 2667050, at *8 (E.D.N.Y. Mar. 28, 2023) (citation omitted); *see Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009) ("Although a causal connection between an adverse action and protected speech may be indirectly established by showing that protected activity was followed closely in time by the adverse action, a plaintiff must still allege that defendants were aware of the protected activity." (citations omitted)); *see Catanzaro v. City of New York*, 486 F. App'x 899, 901 (2d Cir. 2012) (holding that plaintiffs failed to establish the causal-connection element at the summary judgment stage where they had "not presented any evidence that defendants were aware of" their protected speech).

Because plaintiff does not allege or point to any evidence that Commissioner Shea was aware of his statements criticizing the government's actions relating to the child-abuse allegations, plaintiff has failed to establish a *prima facie* retaliation case.  *See, e.g.*, *41 N. 73 W., Inc. v. County of Westchester*, No. 08-CV-4523 (CS), 2009 WL 10740050, at *10 (S.D.N.Y. Sept. 29, 2009) (dismissing a First Amendment retaliation claim because, among other reasons, plaintiff failed "to state with any specificity [when, where, how, or which defendants] were informed" of the allegedly protected activity); *Schulz* 2023 WL 2667050, at *8 (similar); *Knight v. Nassau County*, No. 17-CV-0958 (SFJ) (SIL), 2020 WL 4207439, at *12 (E.D.N.Y. July 22, 2020), *aff'd*, 852 F. App'x 42, 43 (2d Cir. 2021) (similar); *Brady v. County of Suffolk*, 657 F. Supp. 2d 331, 356 (E.D.N.Y. 2009) (similar).  Commissioner Shea is accordingly entitled to summary judgment.

## IV.     The City of New York Is Entitled to Summary Judgment.

Plaintiff's *Monell* claim against the City of New York fails because plaintiff has not put

forth evidence from which a reasonable jury could infer that city employees violated his constitutional rights pursuant to an official policy or custom.

A municipality such as the City of New York can be liable under Section 1983 only if an "action pursuant to official municipal policy of some nature" caused the alleged deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 691; *see Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Municipalities "are not vicariously liable under [Section] 1983 for their employees' actions." *Connick*, 563 U.S. at 60. A plaintiff who seeks to hold a municipality liable under Section 1983 must allege (i) "an official policy or custom," that (ii) "cause[d] the plaintiff to be subjected to," (iii) a "denial" of a federally guaranteed right. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A plaintiff can allege a municipal policy or custom by pointing to "decisions of a government's lawmakers, the acts of its policymaking officials, . . . practices so persistent and widespread as to practically have the force of law" or, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 563 U.S. at 61 (citations omitted). But isolated acts "by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Here, the City is entitled to summary judgment because plaintiff has not set forth any evidence from which a jury could find he was harmed pursuant to "an official policy or custom." *Wray*, 490 F.3d at 195. Plaintiff alleges that the City has "'official and un-official' policies of supporting the filing of false arrests and maliciously prosecuting he and other similarly situated individuals without probable cause" in both criminal and family court. Am. Compl. ¶ 49. But his summary judgment brief points to no evidence of such policies. Rather, it contains only the

15

conclusory statement that "based upon the totality of the facts, . . .  municipal policymakers exhibited deliberate indifference by failing to properly train, supervise, and discipline" the individual defendants.  Pl.'s Opp'n 10–11.  At the summary judgment stage, however, "the nonmoving party" must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Because plaintiff has failed to do so, the City is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, summary judgment is granted to defendants on all claims.  The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: January 18, 2024
        Brooklyn, New York